Good morning. Good morning. Lisa Lunsford for Appellant Linda Coelho. I'd like to reserve a minute and a half, if possible. In this Social Security appeal, we have two treating physicians' opinions conflicting with two non-examining state agency physicians. They all agree on Coelho's diagnosis, review the same objective findings, and yet come to different conclusions about her functional limitations. In relying on the non-examining opinions, the ALJ erred because their opinions are not substantial evidence under the Gallant-Lester cases. Also, Social Security requires that treating opinions be given deference and that non-examining opinions be weighed by a stricter standard, and that's under Social Security Ruling 96-6P. The ALJ here did the opposite. He scrutinized the treating opinions, found several unsupported reasons for rejecting them, and then seemed to just adopt the non-examining opinions by default without applying any scrutiny whatsoever. That was also a legal error. Their – the non-examining opinions in this case are a checkbox form, and they contain no supporting explanation whatsoever. Under these circumstances, their opinions cannot legally outweigh the treating opinions, and that is under the Ryan and Holohan cases, where in those cases also the non-examining opinions were just checkbox forms without sufficient explanation, and they weren't held to outweigh a treating source or an examining source. Alito, could I ask you maybe to skip ahead? I don't want to derail your argument entirely, but there's one particular thing that I'm most interested in. Yes. Could you just walk us through what evidence is in the record now, objective evidence, that she suffered from motor loss or that she suffered motor loss? Could you just walk us through what you've provided in the record that supports that claim? There are, of motor loss, there is Dr. Ramsey's opinion that her right upper extremity function is interfered with by the cervical spine condition as shown on the MRI, and that is in Dr. Ramsey's letter, where she says. Do you have an ER site for that? Yes, I do. 294. Okay. I'm looking at it. Okay. I thought you were going to go there, so just where in this? It's a short letter, but just point us to where you're talking about. In the first paragraph, she describes how the MRI findings are resulting in normal functioning of her right arm and hand. Okay. I see that. There are physical therapy records as well that show that she has undergone physical therapy because she has difficulty with very basic daily activities, such as turning a doorknob and those kinds of things, and the physical therapy records as a whole show that she had, that was why she was in physical therapy, is to get help with dealing with her problems with her right upper extremity. Can you point us to other things like you just did with 294 that will reflect objective observations as opposed to just reports that the doctors are taking down of her own subjective complaints of loss of motor loss? In the physical therapy records, they found gross strength deficits of her right upper extremity, and that is, I believe, on page 217. Based on her? Was that based on the reporting appellant's own reports to the doctors? The physical therapists, I believe they do measurements, and when they are ‑‑ I'm not an expert in physical therapy, but they did note that she had gross strength deficits, and they're observing her and treating her and doing exercises with her, so I would think that they would be qualified to be able to say that. But can the findings be determined on the basis of ‑‑ does it have to be objective observations, or can it be simply based on the report of the individual's reporting to the doctors or the physical therapists of the condition? I think it could ‑‑ I think that that issue hasn't been decided yet. It's our position that some of these traits can be demonstrated with sufficient subjective evidence. I think the error here is that the ALJ didn't discuss any of this evidence. Let's just assume that it has to be objective in the sense that it's got to be ‑‑ it can't just be the patient reporting to the doctor and the doctor just writing down whatever the patient says. They have to objectively observe some kind of evidence of motor loss. You've given us 294 and 217. Is there anything more you're relying on for that, again, for an objective evidence? I'm sorry. I didn't come prepared with all of the motor loss sites. I came prepared with the objective evidence of sensory loss. We got that. Is that mainly the pinprick test? Yes. Yeah. Okay. We've got that. And there's some of that, yeah. Okay. And I did ‑‑ you know, this argument was put forth in front of the ALJ in a prehearing brief before the hearing. And so he was on notice that this was an argument that Coelho was making, is that she met this listing. And for him to provide such a boilerplate statement that her condition just wasn't characterized by these ‑‑ by motor loss and sensory loss was not sufficient under the Lewis v. Apfel case. What's the effect of his ALJ also concluding that the appellants was not credible and determined her statement's not convincing? What is the impact of that? Yeah. I mean, can't he ‑‑ he makes that finding. Doesn't that impact ‑‑ does he have to ‑‑ do you win even if there is some objective evidence to one ‑‑ on one side to support your case? If the ALJ finds that the rest of the evidence doesn't support it, he makes findings that your client is not credible, can't he then reasonably conclude that you're not entitled to the benefits? Not under the facts of this case. The treating physician's opinions are based on her conditions, and there's no indication that their opinions are based, even to a large extent, on her statements. So while we dispute his ‑‑ that his credibility findings were clear and convincing or sufficiently specific, if we're surpassing that and assuming they are, he still can't deny this case based on the medical evidence as it stands, because there is no evidence the treating physicians relied on her statements. They point to her conditions as the reasons for her ‑‑ for their conclusions. But the ALJ says I'm not going to give much weight to Dr. Ramsby and Nurse Ramirez because they greatly exceed the limitations one would expect from the objective findings in the record. Yes. They're extreme in view of the objective findings. And to call them ‑‑ sorry. Is ALJ entitled to kind of evaluate the evidence and make those findings? ALJs are definitely entitled to evaluate that evidence, but his evaluation here was not sufficient. And it's because by calling them extreme, that is his sheer disbelief. It's not sufficiently specific or supported. There is objective evidence of conditions that cause pain, and in this circumstance, he must have sufficiently specific reasons for discrediting the treating physicians. Under Embry v. Bowen, it is not sufficiently specific to say that they're not supported, that the treating physicians are not supported. The ALJ is required to explain why his interpretations of the objective evidence are different and why they are more correct than those of the treating doctors. And so the general allegation here by the ALJ that the treating physicians' opinions weren't supported by objective evidence is not specific enough to ‑‑ under Embry. He also said that they were not well supported by the objective evidence generated by them. He didn't say just by the objective evidence in general. He said generated by them. And that is just unreasonable in a case where you have a primary care clinic who is coordinating her care, and they are referring her out to specialists who are getting MRIs and requesting ‑‑ getting their results and relying on those results informing their conclusions. Counsel, do you have ER 219 handy? There's a notation I wanted to ask you about on that page. Okay. So maybe about a third of the way down in the text there, there's an O. It looks like an O with a colon, and it says, I think, retest strength, symmetrical grip, biceps. I can't read all of that. What does that signify? Retest strength. Symmetrical grip, biceps, deltoid, very weak, bilateral, triceps. So under the O section, that's the objective section where they are making their own clinical observations or doing testing. They were testing her strength. I assume they have devices like a grip. I forget what those things are called. And that this physical therapist was measuring her strength and finding that it was weak, very weak. And so that O signifies objective? Yes, under the general SOAP pattern of medical note‑taking. O is for objective. And S is for, is that just ‑‑ Symptoms. Okay. Statements of symptoms. By the patient. Correct. Okay. Correct. Got it. The ALJ also rejected the treating physician's opinions as failing to evaluate her credibility. And that is not sufficiently specific. What does that even mean, that they failed? He's not saying that they based their opinions on her, too much on her statements. He's saying that they failed to evaluate her credibility. And in the context of this record, it's not a reasonable conclusion. When she's been attending the same clinic for years and years and years, there is one note that shows Dr. Ramsey considered whether she was being truthful about needing another Vicodin prescription because she had lost it. And Dr. Ramsey concluded she was not being untruthful. And so for the ALJ to reject their entire opinion because they allegedly failed to evaluate her credibility is not supported by substantial evidence. The non-examining opinions in this case are not substantial evidence to rely on. And that is under the Lester case, the Gallant case. The Gallant case is similar to ours. Two non-examining state agency physicians said that Gallant could do light work. That's exactly what happened here. And the court held they were not substantial evidence for the ALJ to rely on. The district court tried to distinguish this case by saying Gallant had 11 doctors, but that's a bit of a misleading basis on which to distinguish the case. Gallant had that many doctors because he was hospitalized and saw multiple physicians during the hospitalization, and he moved out of State and switched treating doctors for that reason as well. Ginsburg. I thought the district court, if I recall, I don't think it was just the number, but I was impressed that he was contrasting Gallant where there were he said there was substantial or replete objective findings in the record. So it seems even if this is enough to tip the ALJ, and I don't know if it is, it's hard to say it's replete with objective findings, right? Sure. Do I wish there was more? Sure. Of course. But what we do know is that the Gallant case, it said it was replete with objective evidence. Unfortunately, they didn't describe in any detail what that meant. But what we do know is that Coelho has provided more than adequate objective evidence with her X-rays and MRIs and objective exam findings. And to require that there be more X-rays or MRIs would be redundant. And to require that her treating doctors perform a full, thorough exam at every monthly visit is unreasonable. And under Ornvia-Strew, the purpose of medical records is not to document disability. It's to promote recordkeeping and communication among health care providers. And the doctors don't even have to mention the condition in every visit to be found supported under Orn. All right. Did you want to save the remaining time?  Thank you. Good morning. Shea Bond on behalf of the Commissioner of Social Security. I'm a little troubled by my opponent's discussion of, like, the objective evidence in this case. And I really do think there's a lack of objective evidence in this case.    I'm going to try to make it as clear as I possibly can. to support either the claimant's credibility in this case or the opinions of the treating physicians. Maybe you could just zero in first. I know you've got other things to say. But ER-294 and ER-217, or 219, rather, we looked at both of those. And I have to say I'm not an expert, so I'd be very interested to hear your response. But they look like objective evidence documented by the physician as to motor loss. So tell me if that's not right. Well, let me go to page 219 first. This is a physical therapy record. It's from September of 2003, so it actually predates the relevant period by more than a year. So, I mean, first I would argue that's not time relevant. But as to the note itself, under the objective, the physical therapist, who's not a physician, did note some decreased muscle strength. Wait, wait. I'm sorry. We're looking at ER-294? Oh, I'm sorry. It was 219. I'm sorry. I was looking at that one first. I'm sorry. Let me go to that. Okay. So that's the physical therapy record that's outside of the relevant period. There is some notation of the weakness in the biceps. But when you look to the record evidence that's from the relevant period and that was elicited on one of the few times that the treating physicians actually did examine the claimant and perform an exam. So we have on November 2004. And granted, that's just right like a month before the relevant period started. But her grip strength was registered as 4 out of 5 on the right and 5 out of 5 on the left. 5 out of 5 is normal. I think 4 out of 5 is described as good. The record site for that is 304 and 307. Then you also had in April of 2005, on record site 359, you have 4 plus out of 5 strength. So that's almost normal. So those are the actual clinical findings that we have recording her strength during the period that's relevant to this case. As to Your Honor, could Your Honor give me the other page site? 294. 294. That is from a doctor. That's why I was confused when you said it was just a physical therapy. I'm sorry. I apologize for that. I was jumping ahead of myself. That's the letter from Dr. Ramsey. And just help me on this. This is within the relevant period, so to speak? The Dr. Ramsey letter. She issued this during the relevant period. Okay. So what's wrong with this then? Well, this is just a letter that just kind of generally describes her opinion of what's going on with the claimant, but there's no citation to any of the actual clinical findings that would support this. She says the neck and symptoms prevent her from performing repetitive upper extremity motions, making it difficult to drive, et cetera. But she isn't citing to anything in the treatment records that shows where is this problem coming from. Now, there's the underlying – I'm sorry, I didn't mean to interrupt. Look, the sentence that I guess grabbed my attention was the abnormalities in her – do you see that sentence? The abnormalities in her cervical vertebrae and discs are compressing her cervical nerve root at the level of C5 to 6 and interfere with normal right arm and hand function. Right. She's talking about the underlying impairment, the diagnosis of it. She's drawing that conclusion that there is impairment on the arm function, but isn't describing what is that impairment. If there's no clinical findings to show that there was actual muscle loss, weakness, range of motion problems, there's no reference to that in this letter. And that's the missing element here. Okay. I hear you on that. But what we've got is an ALJ decision that says there's just a complete absence of objective evidence. And I guess it seems to me, don't our cases require the ALJ to give essentially the explanation you gave if in fact that was the basis for his or her decision? Well, it does. But the ALJ didn't disagree with the diagnosis of the cervical degeneration and that it caused an impairment and that it was causing her limitations in her upper extremities. He did assess those upper extremity limitations within the RFC finding. So to the extent that the doctor is talking about there's a compression of the nerve root and the degeneration, I don't think we have a disagreement here between the ALJ and what this evidence says. The impairment exists, and the ALJ found it to be severe. The question is, does this establish the severity of the symptoms as the claim describes and as her doctors opined would limit her functionally? And that's kind of the missing component that we have here. And that's what the ALJ is referring to when he says there's just this lack of evidence. He does discuss the degeneration in the decision, obviously. He talks about the MRI findings, et cetera. But what there's the absence of are these clinical examination findings. And those are different than diagnostic tests. And under our regulations, you know, we differentiate between laboratory findings, which are the x-rays which diagnose Thunderling impairment, and then the signs, which are the clinical examination findings. And I disagree with my opponent with saying that there's this unclear whether, you know, medical evidence can be demonstrated by subjective complaints. Well, no, you know, our regulation at 416.928B specifically says that these signs must be shown by observable facts that can be medically described and evaluated. And that's the missing component that we have here. Most of the treatment records from the relevant period actually specifically say that no examination was performed, or when they were, they revealed the findings I was telling you before with the muscle strength that's almost, you know, fully intact. With sensation, you know, that needs to be demonstrated. And I think at one point there was kind of like the pinprick and the light touch test that was performed, but that was one time. And I think that was like in November of 2003. So once again, well before the relevant period. And we need to focus on what was in the period before the ALJ. You know, the ALJ is pointing out the negative. I think what draws the difference between some of the cases where the ALJ was chastised for just saying there's a lack of objective evidence is that there were clinical findings elicited. He just didn't describe what was it about those clinical findings that doesn't support the opinion or doesn't support the credibility. But here, there's just, there's no clinical findings observed. There's nothing he can contrast and say, well, this doctor didn't support it. Here's what it says. There's nothing to point to here. Those doctors just didn't elicit those examination findings. And as for a case like Gallant, I would disagree that that case is really different than ours, or that it is, because in that case, the claimant, I mean, there was a lot of evidence suggesting that that claimant's complaints were really credible. I think he had undergone three back surgeries. He had like a fusion, a laminectomy. Even after the second surgery, he was still wearing like a cervical corset. He was going in for the third surgery. And as Your Honor pointed out, they actually said there was, you know, it was replete with objective clinical findings. And that's just something we just don't have in this case. I would also disagree with my opponent that with the DDS opinions, that they considered the same evidence as the treating physician. When Dr. Ramsey issued that opinion on page 294, that was issued in April of 2005. I believe in the claimant's reply brief suggests that Dr. Ramsey had looked at a letter from Dr. Pugh, but that's impossible because that letter came out in April. I'm sorry. I'm confusing my dates. Dr. Ramsey issued her opinion in March of 2005, and Dr. Pugh issued the opinion in April. So there was no way that Dr. Ramsey could have actually reviewed Dr. Pugh's letter when she issued her opinions. But the DDS physicians did look at Dr. Pugh's letter. So they actually did look at different evidence. So any case law that says — for her tendinitis in the left hand. And so he had issued a letter. I think it's on page 290, the record. It is. So he said that he just saw some visible swelling, gave her an injection, and she should return. But I don't think she ever did actually return for treatment. So Dr. Ramsey could not have looked at that record when she issued her opinion because it didn't exist yet. But the DDS physicians did have the opportunity to look at that, did have the opportunity to look at the treatment records going from April into September of 2005. Obviously, Dr. Ramsey couldn't have looked at those records when she issued her opinion. So the DDS physicians actually did look at different and more evidence than Dr. Ramsey did when she issued her opinion. And based on that and their review of the entire record, the LJ could consider the DDS opinions, not exclusively. And the LJ said he didn't consider the DDS opinions exclusively. He said he modified their opinions regarding the functional upper extremity limitations and he actually added, you know, more favorable, more restrictive limitations to benefit the claimant. And I would also point out, this actually wasn't brought up in the briefing, but when I look back at the vocational expert's testimony, the vocational expert identified the job of  If you look at the description in the Dictionary of Occupational Titles, that job does not require any reaching, handling, fingering, feeling, or any postural movements to perform the job duties of a surveillance system monitor. And the vocational expert had specifically testified that it didn't require any repetitive upper arm movements and that you basically don't have to lift anything to perform that job. And it's a sedentary job that's performed in a seated position. So I think even if you're taking into consideration, even if you could interpret this record to say that the claimant had additional upper extremity limitations, the vocational expert has already identified a job that would accommodate any additional restrictions because the job the surveillance system monitor just does not require any of those job duties. And I don't know if the panel has any further questions. Can we ask you to affirm? Thank you. Thank you. The mentioning of the relevant period is not a reason ever given by the ALJ for not considering the evidence, and it's not actually any kind of standard within social security law that has to be occurring during a certain period. That the non-examining opinions considered evidence, but treating didn't. It is true that more evidence of Coelho's conditions from Dr. Pugh about the tinnitus came in after Dr. Ramsey's opinion, but Dr. Lash's opinion came in a couple of years later, and so Dr. Lash had that information in the chart available to him, and the Dr. Pugh letter was a letter addressed to Dr. Ramsey. As to the vocational expert testimony, that job still requires that someone be able to the surveillance system monitor job, still requires that someone be able to get through the work day with sitting and standing, and if Dr. Ramsey and Dr. Lash's opinions are credited, Dr. Ramsey says she's not able to get to do more than two hours of sitting in a work day, and not more than two hours of sitting and standing, sorry, not more than two hours of standing and walking. So that job would not be one that the ALJ could rely on. This is a case where there's lots of objective evidence. There are x-rays, MRIs, objective exam findings. Dr. Pugh says the tinnitus cytovitis is severe. After the hearing, she saw Dr. Chung was diagnosed with tinnitus cytovitis in the right wrist, and a later physical therapy session found decreased right grip strength, which is what the ALJ had doubted. In this case, the ALJ failed to sufficiently explain why that objective evidence doesn't support the treating physicians. We keep hearing that over and over, but no one has explained why. And under Embry v. Bowen, it's not sufficiently specific to just allege it's unsupported. We have to hear what the ALJ's interpretations of the objective evidence are, and how those create different functional limitations that are more correct than the treating opinions. That is directly from Embry v. Bowen. If the ALJ just didn't believe in the severity, he had tools to address that. He could have ordered a consultative exam and gotten independent clinical findings, and if that conclusion came out differently, that would have provided substantial evidence for him to rely on in denying this case. He could have also recontacted the treating physicians to get more clarity of how this condition is resulting in such severe functional limitations. He had those tools at his disposal and didn't use them, and the decision that Coelho has gotten does not properly explain why her objective evidence doesn't support how limited she is. Thank you. I thank both counsel for your argument today. The case of Coelho v. Estruz is submitted, and we're now adjourned for the morning.
judges: Zilly, McKeown, Watford